We have several cases on the docket, so we will appreciate it if you keep to your appointed time schedules. The timing is controlled by the lights on the podium. When the yellow light comes on, you have two minutes. When the red light comes on, please conclude your argument unless you're answering a question from the court. Also, if you have record excerpts or are referring to the record during argument, we very much appreciate citing those pages of the record, because we have not necessarily read the entire record. So with that, we'll call the first case of the morning, number 24-10113, United States v. Muhammad, consolidated with number 24-10116, United States v. Muhammad. We'll hear first from Mr. Glasscock. May it please the Court? Yes, sir. Preston Glasscock for Appellant Elijah Muhammad. There are three points that demonstrate the district court's error and why our clients held the reasonable belief that the Northern District could not bring these sex trafficking charges in the Northern District of Texas. First, there's not really a case law analog for this situation. The drug and sex trafficking cases arise from one arrest, one officer, overwhelming overlap in location, and they indisputably share an end date. Second, the court's order errs as to each of the three factors that were supposed to be analyzed. So, first, you have the time factor. On the temporal overlap factor, it found that this case, the human trafficking case, spans a decade or more. But that's not correct. As the factual resume shows, it's March of 2023 to June 14th of 2023 that are supported by the record in terms of the human trafficking case. That period is entirely subsumed by the period of the drug case, according to the last indictment in the drug case. On geography, the court found that it spans multiple states. That's also not supported by the record. There's not a factual basis for it. The factual resume shows Texas conduct, and the overwhelming majority of the conduct was in Fort Worth and the Fort Worth Division. And, most importantly, possibly, Your Honors, you have the statutory and conduct analysis that the cases like McClure and Ramirez and Witte undergo. That analysis is typically a statutory and conduct analysis. The court's order, Record Cite 840, only performed an analysis of whether the statutes at issue were distinct in the drug case and the human trafficking case. So it's just not the full analysis that was supposed to be undertaken by the court. And when you look at the conduct that was overlapping between the two cases, it's critical because- Why, they were drugging the victims, is that your belief? No, Your Honor, I don't know that that's part of the record. But you do see, for example, the human trafficking case was primarily what was discussed by the first officer who testified at the detention hearing in the drug case. You also see that the affidavit that they used to get the search warrant in the drug case was referred to as- the operation was referred to as sex trafficking and narcotics distribution. There was overwhelming overlap between the two cases. There was a poll camera that was used by the Fort Worth officers. It was at the day's end. It was catching, according to the officers, both forms of conduct. Third, it was reasonable for the appellants to believe that the human trafficking matter was resolved by the drug plea as far as the Northern District of Texas is concerned. Now, where do we get that? Elishi says, in assessing a claim of breach, the court considers whether the government's conduct is consistent with the defendant's reasonable understanding of the agreement. Here based on the government's conduct, I can't see how the conclusion that appellants drew is unreasonable. For example, the criminal complaint, the indictment, those came after- excuse me- the sex trafficking criminal complaint and indictment came after the drug plea. Days after. In fact, 30 days after in the criminal complaint and two months after. Who represented them in the Northern District plea agreement? Okay, different answers for both, obviously, Your Honor. You have Mr. Colston who represented Mr. Mohammed, Mr. Kareem Mohammed, and then you have someone named Roderick White who represented my client in the drug case. In the drug case. What about the other case? In the human trafficking case, I am one of the attorneys for Mr. Elijah Mohammed along with my co-counsel, Matt Smid. And then you have Dominic Cruciani for Kareem Mohammed. I'm talking about in the plea negotiations. In the plea negotiations for the drug case? Either one- in both of them, yeah. Was it the same attorneys or- It was the same attorney in- for only one of the appellants for Kareem Mohammed. Mr. Colston, who's here today, represented both- Mr. Kareem Mohammed for both. Okay. I didn't see a discussion of the standard of review in your brief. What is the standard of review for the district court's findings about the temporal and geographic similarities or dissimilarities? So those are factual findings, Your Honor, so plain error or clear error. Clear error. Yes, sir. Okay. You mentioned that nothing in the record supports the assertion that the temporal scope of the sex trafficking should expand back 14 years. I think your brief references the human trafficking period as spanning from 2009 to 2024. That's your brief at page 12. And my review of the record, but maybe I'm missing something, is that law enforcement testified that they uncovered sex trafficking dating back all the way to 2011. Can you help me square those representations? Sure. Yes, Your Honor. You have two different things. Our brief, when it did reference that in the initial brief, references the indictment period, which was 2009 to 2023. The factual resume is March 23 to June 14 of 2023. It's really March 23 to June 23, but if you look at the factual resume and the criminal complaint, there's no basis for anything beyond June 14, 2023 in either case. There is, there was one piece of testimony in which an officer claimed that she, that there was conduct dating back to 2011, but there's no support for that testimony. It's at a detention hearing for the drug case, which I think is an important distinction. It was not in the sex trafficking case. And so there isn't an actual factual basis for that finding. So we don't think that under the Rule 11 and the analysis that the Advisory Committee suggests that is undergone under Rule 11, that that's what can be the basis for a factual finding by the district court. Mr. Glasscock, you're not on the brief. If my name is not on one of the briefs, Your Honor, I apologize. Well, who do you work for? I represent Elijah Muhammad. I understand. Well, you're pro bono. Are you CJA or not? No, I'm not CJA. I work for Norton Rose Fulbright. Okay. And how did you get associated in this? I was appointed by the district court. Your Honor, some things were, there were some complications in this case that required a lot of work for counsel, and as a result, I was appointed by the district court. Okay. Well, all right, whatever. All right. Thank you.  All right. Mr. Cruciani, so who do you work for? I work for Baker Botts, Your Honor. Baker Botts? Yes, ma'am. Okay. May it please the Court, I'm Dominic Cruciani here with Baker Botts representing Kareem Muhammad. And Judge Hendricks, to your question regarding the temporal overlap, the first and second superseding indictment referred to the same time period as the factual resume, March 2023 to June 14th, 2023. The second superseding indictment refers back to 2009, but even that second superseding indictment admittedly does not know the exact dates. The exact dates are unknown. So, but to Mr. Glaskot's point, per the Federal Rule of Criminal Procedure 11, it's the date in the factual resume that the defendant's admitted to, which is that same March 2023 to June 14th, 2023, that should be considered by the Court for the pertinent timeline. And that has . . . What's your authority for that assertion, if I understood you correctly? You just said Rule 11 requires the Court to look to the factual resume alone in determining the temporal proximity to determine whether there's a breach of the plea agreement? So to clarify, Your Honor, under Rule 11, the Court can look to multiple factors, not just the factual resume, but only the admission by the defendant is present here. So the Court can look to an inquiry by a government officer, it can look to the defendant, or it can look to what the defendant admitted to. Here, what the defendant admitted to is found in the factual resume. Well, of course, the factual resume just determines whether there's support, a factual basis for the plea agreement and the guilty plea of the defendant. But we're not limited to that, are we? And if so, is there a case that supports your position? So the Court's not limited just to that. I misheard you. But that is the factual basis in the record that supports that temporal finding. And here, looking to the Court's orders, the temporal factor that we were just discussing is just one of the three factors. There's the geographic distinction, there's the temporal distinction, and there's the statutory distinction. And here, Judge Jones, to your question regarding the standard that we're applying here, the clear error is primarily in the third factor, where the Court, there's not a dispute that the statutes at issue between the trafficking charges and the drug charges are distinct. We're not disputing that. But if you look at, I'm referring to the Elijah record here for ease of reference, at page 840 of the record, where it has the district court's finding and ruling on the motion to dismiss, at lines 20 to 24, the court addresses the statutory distinction, but not the conduct distinction. And misapplying the standard, the lower court clearly erred. And you can look to McClure as the guiding light for that analysis. Specifically, I would direct the Court's attention to 793 to 796 of McClure. And the lower court can be forgiven because, candidly, that third factor is a bit amorphous. It is looking at the statutory distinction and the conduct distinction, and there are multiple components to that conduct distinction. And here the... How do you tie these together other than your arguments that they're temporal and geographically similar? How do you tie drugs and sex trafficking together? Well, Judge Jones, the conduct overlapping, you can see that by the investigation that was looking into this conduct was overlapping, which... But doesn't McClure say that doesn't matter? And, Your Honor, it's not the fact that the investigation itself is overlapping. McClure makes clear that that itself is insufficient. It's the fact that the conduct that was under investigation that's overlapping. Well, suppose it was sex trafficking and tax evasion. I just don't understand. There are different provisions of 18 U.S.C., and I don't understand why the government... Why this language in the boilerplate, conduct underlying and related to the defendant's plea of guilty, when you violate a... Suppose it was sex trafficking and dumping some kind of sludge illegally in the Trinity River. I mean, you've got to do more than just say they're being investigated simultaneously. Certainly, Judge Jones. And I see my time's expired, but I'll address the court's question briefly. It's not just the statutes that are overlapping here that matters, that it's the conduct underlying and related to. And here, there's a plethora of overlap. For instance, the investigation into the AVs in the trafficking case were interviewed, and as a byproduct of those interviews, that information was used to obtain a search warrant for the drug case. That search warrant ultimately produced evidence for both the trafficking and the drug case. There's also the fact that the government itself, if you look at, again, the Elijah Record 294, paragraph 3, itself referred to this as a sex and narcotics trafficking operation. So it was happening in the same place at the Days Inn in Fort Worth, under the same roof, the same conduct was happening, same time, same place, and directly related to one another. All right. Thank you, Your Honors. Okay. Mr. Colston. May it please the Court, Your Honors, what I want to talk to you all about is the plea bargaining process and why that would make it reasonable for these defendants to believe that this conduct could not be prosecuted in the Northern District of Texas. As the Court is well aware of, nearly ninety-five percent of all of the federal criminal cases are dealt with through plea bargaining, and in order for plea bargaining to be effective, the word of the government must also be effective, must be trusted. And I will point, Your Honors, to the record on appeal in the Kareem Muhammad case, page 361, that during the process of plea bargaining, the government provided some additional discovery to the defendants through an email, and in that email, it cited an HSI report. In that HSI report, basically, that report stated that the human trafficking case had been accepted for prosecution by the Eastern District of Texas. Now, in going through the plea bargaining process, any attorney, and specifically myself in this case, with Mr. Kareem Muhammad, would discuss the ramifications of that, inasmuch as that a plea in the drug case, which ended up being a plea to possession of ammunition by a felon, that that plea would not prevent the government from prosecuting him in the Eastern District, but based on the government's representations, the government cannot bring this prosecution in the Northern District of Texas. The parties agree in their briefing, correct me if I'm wrong, that the plea agreement, and the plea agreements in this case, are unambiguous, is that right? Well, I would say that the language is unambiguous, but I think in order to look at that, you would also have to look at that in the context of the representations that the government is making at that time. The reason I ask, and if your position has changed, and of course, we will hear you on that, if the plea agreements are unambiguous, as was represented in the briefing, aren't we limited to the four corners of those agreements, and to determine whether the deal that was made between the parties prevented the later prosecutions? My argument would be that you would have to look at the plea agreement in the context of the information that's being provided, and based on that, at that point in time, the government had every intention of prosecuting the human trafficking case in the Eastern District of Texas. It wasn't until September, and I'm sorry that this isn't in my brief, but I just ran across this information, but in Ray Nicole Hammond, which is a case out of the Northern District, 3,24-MC-00010-0, that's Northern District of Texas 2024, a prosecutor gave an affidavit, which basically says that they were not approached about prosecuting this case in the Northern District until the 19th of September. This was twelve days after the Mahomet brothers had . . . . . . worked together with the Northern District, and the Northern District said, well, we've already agreed not to bring charges in the Eastern, so we'll do it in the Northern instead? No, no, no, no, no. My contention is that all along, they intended to bring this case in the Eastern District. During the negotiation process, you would tell your client, you can still bring charges in the Eastern, you can still be prosecuted in the Eastern, you can't be prosecuted in the Northern. Well, I don't know what happened for some reason, because the government up until this point in time had expressed that this case would be prosecuted in the Eastern District. The reason why that's important is because if at the time that we're signing this plea agreement on the 6th of September, that I think that a case is going to be prosecuted in the Northern District, then it is incumbent upon me to explain that, and it is also incumbent upon me to attempt to work out the best plea bargain deal, not to just plead Mr. Mahomet to one case while leaving another case out there for the government to prosecute. Based on that, I think it's reasonable for the Mahomet brothers to have assumed that by pleading this case, that this case could not be prosecuted in the Northern District. It could be prosecuted, of course, in any other district, but not the Northern District. Okay. Thank you. Thank you, Your Honors. All right, Ms. Grand. Good morning. Good morning. May it please the Court, Amber Grand for the United States. Speak up, please. The appellants are essentially asking the Court to rewrite their plea agreements to create a blanket waiver for any conduct that happened at the same time that they were dealing fentanyl, but of course their plea agreements don't say that. They bar further prosecution for conduct both underlying and related to their pleas. This wasn't some illusory promise. The Mahomet brothers were dealing fentanyl for over a year. There was a constant stream of drug traffic at the Days Inn and at the Forest Hills residence. They maintained multiple premises for that purpose and they carried firearms in furtherance. These facts could have given rise to multiple counts carrying very serious statutory penalties, but they didn't because of the plea deal. The Mahomet brothers knew this was a good deal. So when the human trafficking indictment came down in November of 2023, they didn't object. They didn't claim that the plea agreement had been breached in the fentanyl case and they didn't ask the Court to relieve them of their obligations under that agreement. They didn't object when the PSR addendum was filed two weeks later saying that the human trafficking conduct was wholly unrelated to the fentanyl conspiracy. Instead, they waited. For 73 days, they sat on their plea agreement and they waited until January 19th after they realized the benefit of the rule 11C1C plea deal. The sentences were entered in the fentanyl case and that afternoon they filed a motion to dismiss in the human trafficking case, claiming for the very first time that their plea deals had been breached. Now, Judge O'Connor looked at that motion and he said, those plea agreements bar prosecution for conduct underlying and related to. And he factually determined that these courses of conduct were both temporally and geographically distinct. The appellants have not shown that those fact findings were clearly erroneous. This court can't be left with a clear, firm, definite conviction that a mistake was made in making those findings. And that's why the government would ask the court to affirm. I wanna start with the plea. The plea is the crux of this dispute, right? What is the plea? What does the plea agreement say about it? On page seven of his initial brief, Elijah Muhammad says he pled to count one of the superseding indictment. That is incorrect. That is a misstatement that has significant consequences. He pled guilty to count one of the superseding information. He pled to a single count of possession on June 14th, 2023 at the Forest Hills home, not to a far reaching drug conspiracy. Similarly, Kareem pled guilty to a superseding information to a single count of possession, both of ammunition. Both of their factual resumes contained just two facts. On June 14th, 2023, a search warrant was executed at the Forest Hills residence. And 82 grams of fentanyl was recovered that Elijah Muhammad intended to distribute. That's Elijah's. And for Kareem, it was on June 14th, 2023. He possessed a nine millimeter bullet in his front pants pocket, and he knew he was a felon. That's the plea. So what's the conduct underlying and related to that plea? What is the plea agreement talking about? That drug conspiracy, all of that other conduct that doesn't come in, that they don't get charged with because they've reached this plea deal. But what it doesn't do is prohibit the government from bringing charges for conduct unrelated to those pleas. And that's exactly what the human trafficking case was. There have been a couple of allegations in the initial briefs, the reply brief, and here today that we lack record support for our contention. That these conspiracies were geographically and temporally distinct. So I'm gonna provide the court with some record sites, and unless I specify otherwise, they'll go to Elijah's record, 10113. Geographically, the record shows that the human trafficking conspiracy spanned divisions, district, cities, and states. It existed in Austin, ROA 194 and 299. It extended to Bedford, ROA 193 and 219. Tyler, Kareem's ROA at 244. Mesquite, ROA 222. Dallas, ROA 299.  When you say it extended, exactly what do you mean? That the human trafficking conduct took place in those locations. Does that mean that they had one victim and they were moving her around? Does it mean victims in each place? What do you mean? They were both. There were at least ten victims identified in the human trafficking conspiracy. The record shows that they would drive these victims to what was called the Blade in Dallas, Harry Hines Boulevard, where people go to solicit commercial sex. They would drive them to the track in Houston, which was a similar situation. They would drive them down to Austin to engage in commercial sex transactions. And they would use hotel rooms in Bedford, Mesquite, Fort Worth, and Dallas. It's important to note that the record at page 300 has a list of five different hotels that a victim recalled conducting transactions at, and the days in did not even make that list. The days in was a drop in the bucket when we're talking about the vast conduct underlying the human trafficking conspiracy. The government's exhibit list is at 615. This case never made it to trial, but the government intended to offer hotel receipts from Dallas, Bedford, and Tyler. So there isn't a reasonable, I didn't make it to California, but I do wanna say that the ROA at 195, 316, and Kareem 243 support that this conspiracy conduct also extended to California. The record at 195 supports that Elijah's phone number was linked to 16 online locations in three different states. You look at the geographic location of the Pleas and the Fentanyl case, it's the Forest Hills resident and wherever Kareem was arrested with a bullet in his pocket. The district court's factual finding that the geographic scope of these two courses of conduct were distinct was plainly supported by the record. Let's talk about temporal facts. We're not limited to the factual resume when we talk about the scope of the conspiracy. The court can look to any evidence in the record to support the district court's factual finding that the scope was broader than the Fentanyl Pleas. The record at 314 shows that the first victim was likely in 2011. We know for a fact that Fort Worth PD had opened a human trafficking investigation by 2018, that's in Kareem 244 and Elijah at 320. We know there was a commercial sexting in 2019 where Elijah's cell phone was seized and the fruits of that search were going to be offered at the human trafficking trial in this case, that's ROA 193. And ROA 473 is the court's order on a motion to suppress that cell phone search where the district court says it's undisputed that these investigations spanned back to 2018 and 2019. The reason it went on for so long is because we had so many districts involved. You're dealing with Mesquite PD, Tyler PD, Austin PD, Fort Worth PD, Bedford PD, Child Protective Services. In May of 2023, Agent Cochin with HSI pulled everybody together and consolidated the evidence to try to finally bring this human trafficking case to trial. Realistically speaking, that could probably only happen because the Mohammed brothers were ultimately arrested on the drug charges and their victims felt safe enough to testify to move forward. They'd been calling the police for years because of the abuse they suffered in this case. But it just could never be brought. The evidence wasn't reliable enough because of the stronghold they had on the victims. So temporally, there's no dispute that the human trafficking conduct reached back more than a decade, and the fentanyl pleas lasted one day. Their pleas centered on June 14th, 2023, so those are also distinct. Let's look at the conduct. The claim they've raised today that the district court erred by considering only the statute and not the conduct is being raised for the first time at argument. That is not in their briefs. It's not in their reply. It was not raised in the district court. It's waived. They're also wrong, because the district court talked about the scope of the conduct in this case. I'm relying on record pages 297 to 300, 317, and 465 to 67, the vast majority of which is interviews with victims. The conduct in the human trafficking case involved Elijah, Kareem, and Wade Godet creating commercial sex ads, posting them online, driving the victims to the commercial sex dates, providing condoms and lingerie, retaining all of the proceeds from those commercial sex events, driving them to the track, and forcing them to walk the street to solicit dates, driving them to the Blade in Houston, and doing the same. They instructed them how to perform commercial sex, how to attract repeat customers, how to avoid law enforcement. That's the conduct in running a commercial sex ring. How did they control them? By keeping every penny that was earned from the commercial sex dates, by controlling the telephones that they had access to, and by engaging in violence. One victim was pistol whipped and thrown down a flight of stairs when she wouldn't comply. Another juvenile victim was strangled when she refused to engage in commercial sex. And AV3 was raped in front of AV1 and AV2 when she would not consent to sex with Kareem Muhammad. These acts of violence were how the defendants controlled their victims for over a decade and avoided prosecution. Compare that conduct to the fentanyl plea. They possessed 82 grams of fentanyl with an intent to distribute, and Kareem possessed a bullet in his pants pocket. Those courses of conduct are plainly distinct. Why did, and I assume the sentences for the fentanyl were not very high. 84 months for Elijah, 24 months for Kareem because it was a pistol. Right, I remember that. Okay, and are they consecutive? They are. The district court ordered them, and they argued at the sentencing hearing, asked that they be run concurrent, claiming the conduct was related, and the district court rejected that assertion. At the fentanyl sentencing and the possession of ammunition sentencing, did the sex trafficking come up during that hearing? It did not come up at the fentanyl sentencing. The 80, I'm sorry, and at the ammunition sentencing? No. Okay. What guidelines did the government have for prosecuting the drug, the drug crimes? Correct. 20 years ago, these would have been 30 year, 40 year sentences. So what's different now? Well, because they pled to possession and not a conspiracy. Well, that was because the government allowed them to, so. But the guidelines were lower. I think Kareem was, but. But no, you're talking about guidelines for possession of 82. But if you had had relevant conduct and all that over a period of a year, it would have been quite a bit of fentanyl. It would have. Those are the charges they avoided by pleading. I understand that. I'm asking you about the government. I'm not asking you about why you gave them. I am asking you about why you gave them street deals. That we negotiated the deals in the drug case based on the facts in that investigation. Kareem, at that time, had been observed leaving the residence where the control buy had occurred, but he was not a direct party to that transaction. We had agents observing what was consistent with drug trafficking at the Days Inn and the Forest Hills Home, but none of those transactions had been the hand-to-hand transactions, hadn't been witnessed enough to support a conspiracy charge. I think that those facts probably underlie the government's decision to plead them the way that they did. We also know that we had the human trafficking investigation that was ongoing. Agent Cochin was the agent in charge of both. He testified at the pre-trial hearing that these were completely unrelated courses of conduct, but they knew that that investigation was hopefully going to go somewhere. I wanna talk specifically about Mr. Colston's representations, about what happened during the course of the plea negotiations, and how the record actually supports that they had no reasonable understanding that the human trafficking conduct was included in the fentanyl plea. Before we get there, let me go back to your point about the agent pulling everyone together. Given the geographic scope that you've represented to us of this conspiracy, when the agent pulled everyone together, why was the case brought in Dallas, as opposed to the Eastern District? And related to that, what is your response to the representation that the discovery materials in this case indicate that the government represented that the case would be brought in the Eastern District? Kareem was arrested in Smith County, Tyler, Texas, in April of 2023. That was a sex trafficking arrest. So I think the initial thought was that's where the case would be brought, and that's why the investigative reports, there wasn't a representation to counsel. There was a statement on the investigative report that the case had been brought to the Eastern District US Attorney's Office. But as the investigation progressed, as they identified motel rooms where the commercial sex acts had taken place, as they identified the location of relevant evidence and relevant witnesses, the agents discovered that the bulk of that conduct was in the Northern District of Texas. And that's why the focus of where to bring that suit shifted in the fall of 2023. So the arrest that triggered the investigation kicking off, Kareem was arrested in April of 2023. Initially indicated Tyler, but as the investigation progressed, they searched cell phones, looked at cash app receipts, hotel receipts. All of that evidence pointed to the Northern District of Texas, and that's why the case was ultimately brought there. So at the detention hearing, this is the first time we talk about the human trafficking case, the detention hearing in the Fennell case. We did have Agent Pfeiffer testify at that detention hearing with regards to the human trafficking conduct under the element of public safety. These defendants should be retained for public safety, not because the cases were related. And at that time, the record at 316 and Kareem's record at 253 show both of their counsel vehemently objecting to that testimony, because it had absolutely nothing to do with the drug case. They said these agents are testifying and they weren't even there. They weren't there at the search. They don't know anything about this drug case. So they knew the cases were unrelated at that point. Again, they never moved to object or to withdraw their pleas after the trafficking indictment came down. And in December, December 18th, 2023, counsel for Elijah filed a motion in limine in the human trafficking case. The record at 109 to 110, and he argued that the drug case constituted extraneous matters, not relevant to whether the defendant committed any of the elements alleged in the human trafficking indictment, and that the drug case evidence had to be excluded from the human trafficking trial. The government agreed in the record at page 118, because the courses of conduct were unrelated. That brings us to January 19th. At that point, they've been sitting, 73 days they've been waiting. The indictment's been on file, they haven't said a word. They file a motion in the human trafficking case, and they say our plea deals were accepted by the district court this morning. We've got our sentences. It would have been moot to raise this issue before now. That's just factually incorrect. The plea agreements were fully executed as of August 31st, 2023 for Elijah. And September 6th, 2023 for Kareem. The parties immediately began performing under those agreements. The government filed superseding informations. The defendants entered guilty pleas. They sat for interviews with probation. Both sides were performing in good faith pursuant to those fully executed and binding plea agreements. There was a provision therein that if the district court had rejected the sentence that had been agreed to, they could withdraw from the agreement. But it was incumbent on the defendants to object in the fentanyl court if they thought there was something wrong. If they saw an indictment come down alleging a whole separate conspiracy, and they said, wait, wait, wait, this was supposed to be included in my plea deal here, the time to object to that was before the sentencing court in the fentanyl case. They didn't wanna do that. They wanted the benefit of their plea deal, and then they wanted to loop in the human trafficking case on the back end. It was gamesmanship, pure and simple, and that's borne out by the record in this case. If the contract, the plea agreement here is unambiguous, which is the government's position, is that right? Yes. Aren't we limited to the four corners of the contract in determining whether there was a breach here? So how much can we consider this parole evidence that you're providing today? How does it, or in your view, how should it affect our analysis? The court has taken sort of a two-pronged approach to determining if there was a breach. It looks at the four corners of the agreement, and then it also looks to whether the defendant had an objectively reasonable understanding. The government's position is that that plea agreement is unambiguous, and that just as in McClure, it prohibited the government from bringing charges for conduct underlying and related to the fentanyl plea. We think that answers the question. But to the extent they're bringing in this other evidence to say it's unfair, that some promise was made outside the written terms of that agreement, that the government should be bound by, the record directly contradicts any such contention. Because their conduct from day one was to take the plea deal they got on the drug case, to wait for the human trafficking case to come up, and try to get rid of it on the back end. So we cite that conduct only to rebut their contention that there was some side agreement that was not contained. The court, I have ten seconds remaining. The court in McClure relied on United States versus Williams. 809 F2nd 1072, it's a fifth circuit case from 1987. Williams said, when you have one indictment followed by a second indictment, and you think there was some promise made not to bring that second indictment, you've gotta bring it the first time around. You have to raise it with the first court, or that's evidence that no such promise existed. And for that reason, the government would ask this court to affirm. Okay, thank you, ma'am.  All right, Mr. Smid. Morning. May it please the court. Matthew Smid for Appellant Elijah Muhammad. Regarding the timing of this motion to dismiss occurring on the same day, right. Yes, as we stated in our brief, it wasn't official, but it was moot at that point. But more importantly, as the court could see through the record, there was a contentious pretrial hearing leading up to trial in this case. And there were some issues with discovery, and discovery not being produced to the defense until mid-December. And you'll see in the record a very robust motion to dismiss in this case, where we've had several exhibits. We had to have the exhibits in discovery to be able to see if there was overlap from the human trafficking case. We presented exhibits A through F through our motion to dismiss. So the timing, there was no gamesmanship. We needed time to put this together. And in addition, it was not ripe at that time. Now, Judge Hendricks, to answer your question about the four corners of the agreement, when we look at McClure and Hendricks and Bevel and Witte, these cases that discuss the same topic, they discuss looking at extrinsic evidence to see whether or not it was reasonable for a defendant to really think that this covered both. Now, in regard to the temporal aspect, and it's important because, ordinarily, you see a judge's factual findings and conclusions. And we defer to those, right, it's a clear air standard. And I would be the first in line to agree with that and say judge's ruling's normally okay, but here it's different. Because when we look at the exact phrasing of the judge's findings, he says I find that it's temporally different because it spans a decade or more. And Judge Hendricks made a good observation, and my friend on the other side made the same observation. What about page 311 of the record, or 315, where there's discussion of 2011, right? There's a 2011 reference in the record. Well, that was a vague reference, and it was, well, I think we think the first victim may have been from 2011. There's nothing else to connect 2011 to this conduct admitted to in factual resume of March 1st, 2023 to June 14th. And it's important because when you look at page 19 through 31 of Elijah's record, there's a very detailed complaint made by Officer Cochan. And he's very thorough, I will tip my hat to him there. And he lays out why he feels that this happened, why he feels that this is human trafficking. And the dates he uses are March 1st, 2023 and January 14th, 2023. Very important, June 14th, very important. That is the day, not the same year, not the same month, the same exact day that the drug conduct occurred. So the record simply does not support that this conspiracy went on that long. That it continued, cuz- Counsel, did I understand you to say that your objection to the alleged breach was not ripe until the sentencing in the fentanyl case? Did you use the word ripe? I'm afraid if I misheard you. Yes, ripe. It would have been moot leading up to that because Judge O'Connor had not given the official green light, the acceptance of that plea. So the plea agreement says the government shall not bring additional cases. Yes, sir. So why is this alleged breach not ripe the moment of the sex trafficking indictment? Well, it's- That's bringing the charges. Fair enough, fair question. Our position is, he's not sentenced, it's not official, it's not stamped official with the judge's approval, it's not the final judgment. And until it's accepted, we don't really have a formal agreement that can be effective. So your position is, it sounds like you are, I heard you disagree, but it sounds like you are agreeing with your friend on the other side, that you should get the benefit of the plea agreement in the fentanyl case. Ammunition case, I guess, for that matter. Because obviously, there's no way to, in your view, have a ripe, final, finally accepted plea agreement until the day of sentencing. So you do get the benefit, and everyone, so are you actually agreeing with her that that's the way that this should work? You get the benefit of the one deal, and then you get to try to sort of lay behind the log and challenge the second indictment. Yes, sir. The chronology was so important. The fact that the drug case happened first. And it's interesting how it played out like that. If this conspiracy truly went back so far from 2011, why would this case not be first? Do you have a case that says that you can do it this way? She cited Williams, which is the basis of McClure, to say that you're wrong. And then in fact, if you have a problem with a breach, you have to bring it up in the first case so that you precisely don't get the benefit of the first plea agreement. Do you have a contrary citation to say she's wrong? Interestingly enough, I think McClure gets us there, because McClure says it's not as simple. We have to really look at all three of these factors together to see if there is a reasonable belief. You look at the extrinsic evidence to see if there's a reasonable belief. So that's what it comes down to. And geographically speaking, it all happened in Fort Worth. You have 294 of the record and 305 of the record where he is saying, the officer in the case is saying, this conduct, the drugs and the sex trafficking, happened at the same time at the same location in Fort Worth. Significant geographic overlap. All right, thank you, sir. Thank you. To the extent you gentlemen are court appointed, we very much appreciate your service. And to the extent you're pro bono, we also appreciate your service. Thank you. Thank you.